## JOE PAYNE v. STATE.

No. A-3476.    Opinion Filed July 16, 1921.
(199 Pac. 581.)

(Syllabus.)

**Trial—Instructions—Sufficiency in Absence of Specific Request.**
In a self-defense case, an instruction on "provoking the diffi-culty" examined, and held sufficient, in the absence of a. request for a more specific instruction.

Appeal from District Court, Oklahoma County; John W. .Hayson, Judge.

Joe Payne was convicted of manslaughter in the first de- .gree, and he appeals. Affirmed.

This is an appeal from the district court of Oklahoma ·county, wherein plaintiff in error, Joe Payne, hereinafter ·designated defendant, was convicted of the crime of man-slaughter in the first degree, and sentenced to serve a term ·of four years' imprisonment in the state penitentiary.

The material testimony is substantially given by the wit- ·nesses as follows:

A. L. Sparks testified for the state in substance as follows: That he lived at 702 East First street, Oklahoma City, was 45 years old, and was connected with defendant in the pool hall business at 215 East First street at the time the trouble occurred; that he was acquainted with deceased, George Ellis, and saw him in defendant's pool hall the first time about 7 or 7:30 p. m. on April 30, 1917; that deceased came up by the counter and asked witness about a drop cord, and witness did not understand what deceased was talking about, and deceased took witness back to the toilet room and showed him a cord about four feet long, and asked witness to buy it and witness told deceased he would have to see Mr. Payne, defendant, about it; that Payne was then playing pool at the fourth table back; that deceased walked back to Payne, and witness heard them talking, but did not understand all that was said, but heard Payne tell deceased that when he (deceased) fixed that window that he owed him for, a glass that was broken out of it, he could have the drop cord; Payne was speaking in a loud tone of voice; that he next saw deceased leave the building and come back in about a half or three-quarters of an hour and go back towards where defendant was still playing pool; that defendant ran out and left his pool cue sticking up on the front table, and came back with a gun in his hand, and went on to the back end of the building, and witness saw defendant and deceased afterwards coming toward the front of the building, and defendant had his gun and told deceased to throw up his hands, and they came toward the front keeping the tables between them, Payne on the west side and deceased on the east side; heard shooting; thinks deceased had some bundles under his left arm when he came into the building.

On cross-examination witness testified that the wall on the west side of the room looked like it had been shot into; that defendant had deceased ejected from those premises; that deceased had been running the pool hall before that time; that

he heard deceased tell defendant not to pull his gun on him, and deceased held his hands up, and defendant kept deceased going back; did not see deceased pick up anything and did not see him put his hand in his pocket; reports of the guns seemed to be of different fires; thought more than one gun was fired; that deceased did not throw up his hands when first ordered to, and witness did not know positively whether deceased had a gun, but it looked like there was going to be some shooting, and witness left the pool room; had never heard deceased make any threats against defendant.

Jim Bailey testified for the state in substance as follows: That he lived at 209 East First street; 20 years of age; acquainted with defendant and deceased; was in front of 215 East First street a short time before the shooting occurred; when in front of the building saw defendant and deceased in there just a little past the second pool table; deceased was on the east side and defendant on the west; heard Payne say, "Well, get out of here;" deceased said "Wait just one minute; let me explain;" saw something was going to take place and left and went home; defendant had a gun at that time; heard deceased say he did not want to have any trouble; heard defendant tell him not to go down there, that he had been lying and laying around there too much; that this shooting occurred after dark, but the building was lighted with electric lights.

W. H. Slaughter testified for the state in substance as follows: That he was a practicing physician in Oklahoma City for 14 years; knew George Ellis in his lifetime; deceased was brought to witness' office at 327½ East Second, about three blocks from the pool hall; deceased had two pistol wounds in his body, one in his right arm just above the wrist, and one just above the left kidney coming out in the abdomen just above the navel, going clear through; found a bullet in the

latter wound in the mouth of the wound in front near the navel; it was right about dark when deceased was brought to witness' office; had deceased sent to hospital; the wound passing through the body was a fatal wound.

On cross-examination witness testified that he knew a bullet entered back of the hip on account of the wound that was made through the body. The wound on the arm entered above the wrist and came out below the elbow to the back. Witness further testified he had been down to the building after the shooting and noticed walls on the east side, and noticed what was apparently bullet holes, but did not examine the size of them.

Isaac W. Young on behalf of the state testified in substance as follows: He was a physician; lived in Oklahoma City about ten months; came from Boley, Okla., and had been practicing medicine about six years; knew deceased by sight only; saw him on the evening of April 30, 1917, at Dr. Slaughter's office, lying on a couch, very weak and pale; found two gunshot wounds, one in right arm, the other through the body along through the trunk; wound in the right arm entered lower third of the forearm and came out just below the elbow in the back; the other wound entered a little to the right of the spinal column and came out near the navel, probably 2 or 2½ inches above the navel; the bullet was found lying in the navel.

W. M. Fant testified on behalf of the state in substance as follows: Resident at 823 East Third street; had known deceased about five or six years; saw him after he was shot going east from the pool hall at 215 East First street; did not see how far he went, but not out of the block as he was lying down when witness saw him; witness heard the shooting, and this was about four or five minutes after the shooting; was at Dr. Slaughter's office and helped take deceased

to the Emergency Hospital; was there when he died about an hour later.

John Coopwood testified in behalf of the state in substance as follows: That he lived at 19 East Ninth street; knew deceased five or six months before his death; was at the pool hall of defendant on the evening of April 30, 1917; went in to shoot a game of pool, and was leaning over the table and heard one of the boys say, "I am————," and raised up to see what the matter was, and there was some one there, and I asked them what was the matter, and he said Ellis wanted a drop cord and Payne did not want him to have it, and I went on playing, and about that time Payne came downstairs and looked me in the face and went back in the pool hall, and I turned around to see what was going on, and Ellis came toward the front of the room on the west side, and Payne said, "Did you get that drop light?" and Ellis said, "No," and Payne said, "Where did you get that?" (he had it in his hand), and Ellis said, "Lay down that gun," and Payne started around to Ellis' side of the table, and when he got near Ellis he asked him to lay that down, and he asked him what he was going to do, and he told Ellis that he had a notion to kill him, and he started around the table, and then Payne and Ellis went up to another table, and Payne shoved him up and tried to get up around him, and Payne shoved him up by that table and shot twice, and then Payne got up and run out of doors and went down First street. Ellis had nothing in his hands. Defendant had a gun in his hand; looked like a long-barreled gun. After Ellis was shot, he ran out on the street and went about 50 feet and fell, and was then taken to Dr. Slaughter's office. At the time of the shooting witness saw Ellis, Payne, and a woman in there, and a half dozen other men that witness did not know. Witness was standing in the front door at the time of the shooting.

Sparks, recalled, testified that Payne's gun looked to be about a 45; never saw Ellis' gun.

Mike Connors testified that he was a policeman and had been for 11 years; knew Joe Payne, defendant, and saw him on the night of April 30, 1917, after shooting took place; arrested defendant; defendant turned over his gun to witness, and there was two loads in it and three had been shot; defendant said he shot George Ellis, but witness did not remember what defendant said about the particulars of the shooting.

R. F. Ketchum for defendant testified in substance as follows: That he was a truck driver for the O. K. Transfer Company; that he moved the effects of deceased from 215 East First street on about the 5th of April, 1917, consisting of about five pool tables and other fixtures; that in carrying out the goods Ellis spoke about a gun and about being a good shot.

Jim Gardner for defendant testified in substance as follows: That he was a laborer on concrete work; knew defendant, but did not know deceased personally, but knew him when he saw him; was in the pool room of defendant on April 30, 1917, and was playing pool with defendant; saw deceased come in and deceased and Payne and his partner, Sparks, were talking about a light or something; deceased told Payne that he wanted the electric light, and Payne said he could not get it until he put that glass in the front, and deceased started towards the front door and turned around and said, "Well, I will get that light or I'll whip your old bald head," and then walked out. Deceased came back in about 20 minutes and said "I have come after that light, Mr. Payne," and Payne said, "George, you don't get that light," and Ellis walked to the rear and Payne laid his cue down on the front table, and walked on out the front door, and I walked out behind him. Payne

went upstairs; I was not in there when the shooting took place, but heard five shots fired.

Rebecca Herro for defendant testified in substance as follows: That she was the sister-in-law of defendant, and lived in Ennis, Tex., but was in Oklahoma City on the 30th day of April, 1917, at her sister's upstairs over defendant's pool hall; saw deceased in pool hall that night standing on the east side; defendant was standing on the other side; was upstairs when Payne came up and followed him down, and when I went on downstairs deceased was talking to Payne, and I walked up to Payne and told him this was uncalled for, and I says "There is no need of this at all," and I walked up to him, and so this man over by me he says, "Why, God damn Joe Payne; I am not scared of him," and he commenced cursing him, and another man says, "Come out of the way," and so when I looked back I seen this man starting for his gun, and I walked on back to the door, and they commenced firing, and I don't know which one fired first. I went on outside after the shooting; Payne went upstairs after the shooting, and it was not long before the officers came.

On cross-examination witness testified in part as follows: That she was sitting upstairs in the hallway when defendant came up and passed on through. When defendant came back I asked him what was the trouble down there, and he said there was a man down there bothering him was all. I didn't see a gun and he didn't seem to be excited. I went out and down after I heard loud talking down there. There was a crowd out in front when I went down.

W. M. Posey testified for defendant in part as follows: That he was a hod carrier; lived at 430 West Third street; that he knew both deceased and defendant, and was in defendant's pool hall on the night of April 30, 1917, and con-

cerning what occurred there we quote from the record of his testimony as follows:

"Q. Did Ellis go back of this table? A. Went right on into the back. Q. And there was a drop cord inside there? A. Yes, sir. Q. Then when you went in you did not notice him? A. He came in after. Q. And you did not hear what was said? A. Did not hear what was said between he and Payne. Q. And Ellis come out? A. Yes, sir. Q. You may state now what he said, if you recollect. A. Well, when he come out he asked Payne did he want to buy it, and Payne told him 'No', and he said, 'All right,' and he told him that he would not buy it and that he wanted him to get out of there, and George said 'By God' that he was going to have that light, and that he was going to get that light before he left the building, and he went out and was gone about 15 or 20 minutes, an then he come back in and come around with his hand in his pocket, and he went around the south end of the tables and went back in the room, in this corner. Q. What hand did he have in his pocket? A. Had his right hand in the front coat pocket. Q. Did he have a bundle under his arm? A. Did not have anything—I never noticed if he had anything in his left arm or not. Q. Did he have anything under his arm or about him that would have kept him from fighting any man."

"By Mr. Callihan: Objected to for the reason it is incompetent, irrelevant, and immaterial.

"By the Court: Sustained, and exceptions allowed to the defendant.

"A. Well, he went on back, and after he got back there Payne dropped his cue on the table and just got towards— well, he just run out and run upstairs for his gun, that is, I supposed he did, I did not know particularly that, but he run out and come back with his gun in his hand, and I commenced to leave, commenced moving. He come down some stairs that went on the outside of the building there, and he went on in the building, and we went out of the building and walked a little ways down the street. Q. What did you do that for? A. Well, I did not feel like I wanted to get shot, and I

did not want to go in and did not want it to happen, for I thought there might be a little gun play.''

On cross-examination this witness testified in part as follows:

"'Q. Now, when you stated all that was said, you only told just the conversation between Payne and Ellis, just the conversation about the drop light? A. I think I stated about all that was said, yes, sir. Q. Payne told him that he could not have it, and he said that he would, and started out and Payne told him not to send anybody for it? A. Well, he had not moved out of his tracks. Q. And he told him that he would get it, and Payne told him not to send anyone? A. Yes; told him not to send any one for it. Q. Then what did Ellis say? A. Simply said that he would get it himself. Q. And did he not tell him that he would leave it there? A. Simply said that he would sell it to him, and Payne told him that he did not want to buy it. Q. Well, Ellis told him he would sell it to him? A. Yes. Q. What did Ellis say then? A. Payne told him that he did not want to buy it, and that he could not have it until he had fixed that pane he had broken, and then Ellis said, 'By God' that he would get it himself, and that was after Payne had told him not to send any one to get it, for he would not let them have it. Q. And then he went out? A. Yes, sir. Q. And in about 15 or 20 minutes he come back? A. Yes, sir. Q. And he had his right hand in his coat pocket? A. Yes, sir. Q. And you did not see anything in his pocket, any pistol or anything like that? A. I did not. Q. Did he move any more than to tell Payne that he had come after that light or drop cord? A. He started back to get the drop cord. Q. Did he say anything to Payne? A. Not a word that I heard, only passed by going that way. Q. You was looking at him? A. Right square at him. Q. And he never did take his hand out of his pocket? A. No, sir. Q. And you did not notice him throw his coat back? A. No, sir.''

George Clarady, a witness for defendant, testified in part as follows: That he had lived in Oklahoma City 20 years, and was at the Payne pool hall on the night the difficulty occurred;

that he got there about the time the trouble arose, and detailed what he saw as follows:

"Q. Go ahead now in your own way and tell the court and jury what time it was, how it occurred, and what occurred on that occasion. A. Well, I just come into the pool hall, and I seen the boys all running, as if something had happened, and I just walked in to a small store and asked what the trouble was, and then I went in there, and there was no one in there except Payne and George Ellis and another colored fellow, and they was all scared and had scattered out there, and Mr. Payne walked in towards the back, and George went down that way on the east side, and when he got near him he says to him something, and I said, 'Don't shoot that man;' that's the words I heard; and Ellis stopped, and Payne said to him, 'Go on out of here,' and I was on the east side, and George Ellis walked on the east side towards me, and when Ellis got to me, Payne come on the west side, and he says, 'Don't stop; hold your hands up and go on out of here and don't stop,' and he set his right foot out towards Payne, and right about that time Payne shot. Q. What did Ellis have in his hand? A. Had a small bundle under his left arm. Q. Did he have a gun in his other hand? A. Well, he did not hit him, and he started out then, and I did not see any gun. Q. Then what happened? A. He told him to get on out of there and shot in the air, and then about that time he walked out. Q. You say that George Ellis had come back to the fourth table, there four tables there? A. Yes, sir. Q. That's where this trouble began? A. Yes. Q. Where did you see Payne then your best recollection? A. Why, he was there in the hall there, at the first table. Q. The first table? A. Yes; near the door. Q. Where was Ellis? A. At that table, on the east side, he was coming in there when he told him to stop and throw up his hands, and then he stopped, and Ellis was coming around the end of the table. Q. And then when he told him to stop they were just about facing each other squarely? A. Yes, sir. Q. And did he stop there at the end of the table when he met him there towards the west? A. He was facing the west; yes. Q. And you say that Ellis had a bundle under his left arm? A. Yes, sir. Q. And did he have a gun in his right

hand? A. Well, it was down there, and I did not see. Q. Well, then, right after that time was when the shooting begun? A. Yes, sir. Q. And how many shots; four? A. Three was what I heard, I think."

And on cross-examination this witness testified in part as follows:

"Q. And was there anything between you and he then? A. I was standing right close. Q. Was there anything to have prevented you going around and out of there? A. No; I·had no business there except just stopped in and used to stop in there. Q. Could the defendant have raised there and shot? A. Nothing to prevent it, I guess. Q. Where was George when he told him to get out of there? A. At the east end of the table there. Q. And then the defendant went to the east side? A. After that ·he advanced and told him to get out; yes. Q. And then where did he go? A. He went to the east side and told him to get out. Q. He was on the opposite side? A. Yes; but he told him to get on out of there. Q. Well, now was Ellis over north of there? A. I don't know exactly; he was on the east when I went in there. Q. And Ellis then started out? A. Yes, sir. Q. And Payne turned around with his gun in his hand and fired? A. Yes. sir. Q. And then did he walk out or stay right there? A. Yes, sir. Q. Ellis went out and started east? A. Yes, sir. Q. And Payne started out after him and shot him? A. He told him to throw up his hands, but he did not, and there was some shots exchanged there. Q. Where was that? A. That was east from the store."

R. Ketchum, recalled, testified for the defendant that at the time he moved deceased's goods on April 5th he saw a gun, and that deceased said he was going to take the gun and shoot Baldy Payne with it.

Joe Payne, defendant, as a witness in his own behalf, testified that he was 54 years of age; lived in Oklahoma City 12 years; that he was running a pool hall at 215 East First street; commenced in April, 1917, after he had ejected deceased from

said premises on account of his allowing gambling in there; that deceased seemed to get mad because he was moved out. Referring to the trouble at the time of the shooting, he testified as follows:

"A. Well, Ellis come into the pool hall, and I did not notice him when he first come in. The first was when Mr. Sparks come in, and I and this young man was trying to play a game of pool, and I looked up and seen Ellis there with Mr. Sparks, and he come up to Mr. Sparks, and they come up and looked at us, and then I noticed that Ellis was there at the back door, about six feet away, and there was a window light there that he had broken plumb through when I had looked through there and would not let him run a gambling hall there, and I walked to this door, and Ellis was talking about something, I don't know what, but anyway he turned back to me and Mr. Sparks, and Sparks says, 'Payne, Ellis says that globe up there is his; and he wants to sell it to you, and wants to sell it for 75 cents,' and I says, 'Now, Mr. Ellis, I don't think that you ought to move that or take it way from here.'   Q. And what did he say?   A. He said that he was going to, and I told him I did not think that he ought to for the reason that he had broke the glass in the door, and I thought that he ought to fix it, and did not think that he should take that until he had fixed up the glass that he had broken, and he said that he did not break it, but I told him that one of his patrons did, and I told him that he had to leave that alone and not take it out until he had fixed that glass, and he said he did not do it, and I said, 'You broke that window when I was there looking there, threw a bottle through it, and he says, 'Yes; I did, Payne; I did that,' and I told him that he had to have it fixed, and then he was welcome to that drop, but I did not want him to touch it until he had fixed the window, and he started out then and scratched his head and says, 'Well, I am going to send a man for it,' and I says, 'Now Ellis, don't you send any one for that light, because I will not give it to them, and don't you send any one for it, don't you do it for I will not let them or you take it out until you have fixed that window.' Well, he stood there a little bit, and then he turned and walked off, and I did not see, and then he said that he would come and get it himself,

or something about damn black head or something like that and went on out. And he went on out, and then he come back in, and he had his hand in his coat like he had something in his clothes—

"By Mr. Scothorn: We object to that and move that it be stricken for the reason that it is incompetent, irrelevant, and immaterial.

"By the Court: Overruled and exceptions allowed.

"A. And he come back in there, and I told him to get out, and he kept on coming back there, and I run out and went up stairs and got my gun, and he had cursed around there, and after he went out he stayed about 20 or 30 minutes, and then I looked up and seen Ellis coming in at the door again, and when he come in at the door I did not know what to do, and I just started to shoot a game of pool, and I noticed him and thought that it might be that he did not aim to go back, and when he just come right on in and just kept coming right on in, and come down that way with his hand in his pocket. Q. Did he have his overcoat on? A. Yes; he had his dress coat on. Q. And when he went on looking that same kind of way and went by these pool tables on the west side there, and would stand by one corner and then pass on to the next table, and I thought that he might pull his gun out at any time, and I told him to get out, and he kept on coming, then I threw the pool cue there on the first table and run on out there and run upstairs and got my gun and come on back down with my gun to protect myself. I did not want to kill and did not intend to kill anyone, but wanted to protect myself and my property, and he kept his hand in his pocket and started to pull it out, and I was going to protect myself, so when I went back into the pool hall I went down to the third table and I met him, facing that table and I stopped and he stopped there, and he said, 'What is the matter, Payne?' and I asked him what was the matter with him, and he says, 'Why, are you just fixing to raise hell or something, and go on, you have been running over me for about three months and I am tired of it, and if you don't give me my drop cord and light'—and all that he would do, and I did not pay much attention, only I told him to get out of there and to put up his hands. And he said that if I did

not quit bothering him that he was going to shoot me, and
he just kept on walking towards me, and walked back to the
end of the first table. Q. And did you not go back. A. Right
back. Q. And he was back of you all of the time?

"By Mr. Callihan: Objected to for the reason it is lead-
ing and suggestive.

"By the Court: Overruled and exceptions allowed.

"A. Yes, sir; he walked right along there all of the time,
and I kept on going there until we got near the first table
there in the door there, and I throwed by gun down on him
and told him that if he come in any farther I would kill him,
would kill him as sure as his name was Ellis, if he come on to
me, and I told him to keep his hands off of that gun and put
them up, and he says that he would not do it, and he started to
pull his gun, and I pulled mine, and he walked towards me, and
I looked at him and told him to put his hands up and get out
of there, that I did not want to have any trouble. Q. What
did he say to that? A. Did not say anything, and I told him
to go on away, that I did not want to have any trouble and
did not want to kill him, but told him if he pulled his gun that
I would kill him. I said to him, 'Now, George, throw up your
hands and go on through there and go on out and leave that
room and go on away from here, and don't come back here,'
and then I said, 'Now, George, you go on out of here.' Q. What
did he say to that? A. He went around the end of the table,
facing me, and said, 'God damn you, you don't think I will kill
you,' and I told him to throw up his hands and get on out, and
he come around the end of the table and come down towards
me, and I threw down my gun, because he tried to get his
from his coat, and I tried to keep him from getting it. Q. Did
you shoot? A. Yes; I tried to keep him from getting his gun
and shot at his arm, and he pulled his hand out from the in-
side, and then I shot at him the second time. Q. I will ask
you if you would have shot at all if he had not pulled his hand
out and tried to shoot you? A. No, sir; I had no right to shoot
him and did not want to; I was trying to get him out of there
to avoid any difficulty, and to keep from having trouble with
him.''

O. L. Price, for defendant, testified that he was a justice of the peace, and knew defendant; that defendant had called upon him in regard to getting deceased out of his premises because deceased was gambling and bootlegging in there; that no suit was ever filed for that purpose, and witness was later advised that deceased had left the premises.

C. S. Graves testified for defendant that he rented the premises where the trouble occurred to Joe Payne; that he refused to rent said premises to deceased; that he was acquainted with Joe Payne, defendant; and that his reputation for peace and as a law-abiding citizen was good.

Louis Vance, for defendant, testified that he lived on East Fourth street, and was upstairs over the pool hall the night the killing took place, and saw George Ellis down there that night about 7:30 or 8 o'clock; heard Ellis say, about two weeks before the killing, that if Payne fooled with him, he (Ellis) would shoot him on his bald head.

On cross-examination witness testified that he was a tenant in the rooming house belonging to defendant.

E. W. Perry, for defendant, testified that he lived at 605 East Second street; was a minister of the gospel; knew defendant for a year or more; that his reputation for peace and quietude was good.

W. L. Fant, a witness for the state, in rebuttal testified that he ran an automobile shop; knew defendant, and his reputation for peace and as a law-abiding citizen was bad.

Giddings & Giddings, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall and E. L. Fulton, Asst. Attys. Gen., for the State.

MATSON, J. (after stating the facts as above). We have quoted extensively from the testimony of several wit-

nesses in order that a clear impression may be had of the issue presented.

The only error complained of is the giving, over objection and exception of defendant's counsel, of the following instruction:

"You are instructed that, if a person voluntarily arms himself and seeks another for the purpose of provoking a difficulty for the purpose of and with the intent upon the part of such person to take the life of his adversary, a killing under such circumstances, of his adversary, cannot be excused or justified upon the grounds of self-defense, and in this case, if after a fair and impartial consideration of all of the testimony in the case you believe that the state has established by the evidence beyond a reasonable doubt that the defendant in this case voluntarily armed himself and prepared for difficulty with the deceased, George Ellis, with the intent upon his part to kill the said George Ellis, and after so preparing and arming himself he sought out the said George Ellis and provoked a difficulty with the said George Ellis for the express purpose and with the intent upon his part to take the life of the said George Ellis, and under such circumstances did take the life of the said George Ellis, then and in that event the killing of the said George Ellis by the defendant would not be justified upon the ground of self-defense, regardless of what the difficulty between the two might have been prior to that time."

It is contended this instruction is erroneous for the following reasons: (1) No evidence to support it; (2) fails to call attention of jury to any acts of defendant which would constitute "provoking a difficulty."

Without entering into a lengthy discussion for so holding, it is apparent from the excerpts of the evidence herein set out that the trial court did not err in giving an instruction on the question of "provoking the difficulty."

The defendant's pool hall was a public place at that time.   The deceased had a right to go there on a lawful mission, and he had a right to take possession, in a peaceable manner, of the personal property belonging to him which he had inadvertently left there when he moved his effects therefrom two or three weeks previous.

Defendant had no right to use a deadly weapon on the deceased merely to protect his property from a trespass not amounting to a felony.

According to the state's evidence, and some of that for defendant, the deceased did nothing prior to the shooting indicating an intention on his part to commit a felony on the property of defendant, or on defendant, or to do him serious bodily injury.

Under such circumstances the action of defendant in going out of the building to get his pistol, in returning thereto, in pointing the same at deceased, in ordering deceased to hold up his hands and back out of the building, were overt acts on defendant's part entitling the jury's determination of the question of whether he "provoked the difficulty" and was the probable aggressor in the shooting affray which followed.   If those things were done by defendant with the preconceived intent to take the life of deceased, the crime was murder.

In any event such unlawful conduct would result in depriving defendant of his right of self-defense, unless he afterwards in good faith attempted to withdraw from the conflict which ensued, and, while there is no substantial evidence in this record requiring the submission of the "withdrawal" issue, the trial court covered that question in a prior instruction.

The instruction complained of correctly states the law. It is incomplete only in so far as it fails to call attention to

those overt acts above enumerated which amounted to a "provocation of the difficulty." No more specific instruction along this line was requested, nor was any request made that the trial court give a definition of the term "provoking the difficulty." In the absence of such requests and in view of the undisputed evidence that the deceased was shot once in the back, the bullet ranging directly through the body from median line to median line, it is evident that defendant shot deceased at a time when deceased was leaving the building with his back toward defendant, and this theory is borne out by testimony of state's witnesses, or else after deceased was on the street and was walking away from defendant, and this theory is borne out by a witness for defendant.

Defendant was represented by able counsel, and, we think, was extremely fortunate to escape with a conviction of first degree manslaughter with minimum punishment imposed.

Judgment affirmed.

DOYLE, P. J., and BESSEY, J., concur.